UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

            - v -                    :            **MEMORANDUM DECISION**

ANGEL MARTINEZ,                    :            06 Cr. 987 (DC)

           Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:            DAMIAN WILLIAMS, Esq.
               United States Attorney for the
               Southern District of New York
                     By:    Patrick R. Moroney, Esq.
                            Assistant United States Attorney
               One Saint Andrew's Plaza
               New York, NY 10007

               ANGEL MARTINEZ
               Defendant *Pro Se*
               No. 59541-054
               FCI Allenwood Medium
               P.O. Box 2000
               White Deer, PA 17887

CHIN, Circuit Judge:

        Before the Court is defendant Angel Martinez's *pro se* motion for

reconsideration of two orders of this Court: a July 23, 2020 order denying his motion for

a sentence reduction under Section 404 of the First Step Act of 2018, Pub. L. No. 115-391,

132 Stat. 5194, 5222 (2018) and an August 3, 2021 order denying his motion for

compassionate release under 18 U.S.C. § 3582(c)(1)(A).  Dkt. 184.  Because Martinez has

submitted new evidence and several years have transpired, I treat the motion as a new

motion for compassionate release.  For the reasons set forth below, the motion is

granted, and Martinez's term of life imprisonment is reduced to time served plus no

more than thirty days.[1]

<u>**Statement of the Case**</u>

I.      <u>**Background**</u>

Martinez was born and raised in the Bronx, New York.  For the four years

preceding his arrest in the instant case, he resided in the Bronx with his girlfriend of

seven years, Mayra Padilla, and their 4-month-old son.  Pretrial Services Report ¶ 1.

Martinez has four other children with three other women.  *Id.*

On November 2, 1992, shortly after being informed that Herbert Ortiz was

selling drugs on his "turf," Martinez -- together with Steven Mangual and George Torres

-- shot and killed Ortiz while he was making a call on a payphone.  Dkt. 137 at 2.  After

Ortiz collapsed to the ground, Mangual and Torres fled.  Martinez, however, stood over

Ortiz and continued to fire rounds into his body.  *Id.*

---

[1] At page 4 of Martinez's motion, he asks the Court to reduce his life sentence to a term of twenty-five years.  But then at page 23, he requests "time served."  Dkt. 184 at 4, 23.  While there is a lack of clarity regarding his request, in light of his *pro se* status and the terminal nature of his illness, I construe his motion as one for a sentence reduction to time served.

The murder helped Martinez transform his organization into a substantial narcotics operation, and he was at its helm for the next fourteen years. *Id.* Martinez's drug organization sold crack, twenty-four hours a day, seven days a week. *Id.* at 2-3. Distribution eventually reached a kilogram a week, netting Martinez a weekly profit of approximately $13,000. *Id.* at 3. Martinez was involved with a crack distribution organization from 1991 to November 2006. Presentence Investigation Report ("PSR") ¶¶ 2, 18. Based on this and other information uncovered during the DEA's investigation, Martinez was arrested.

On October 29, 2009, a jury convicted Martinez on two counts: (1) conspiracy to distribute and possess with intent to distribute 50 grams and more of crack cocaine, in violation of 21 U.S.C. § 846 ("Count One"), and (2) conspiracy to commit murder in furtherance thereof, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2 ("Count Two"). PSR ¶¶ 2-3. Martinez's arrest occurred on November 21, 2006. *Id.* at 3. He was detained without bail. *Id.* at 25. Martinez has therefore been in continuous custody for 17 years and 10 months.

On February 17, 2010, Martinez appeared for sentencing. Dkt. 171 at 2. During sentencing, I considered that Martinez, who was thirty-six years old at the time, had a string of New York State convictions: a 1990 conviction for unlawful use of a controlled substance, a 1993 conviction for attempted assault, two convictions -- in 1995 and 1996 -- for unlicensed operation of a motor vehicle, and a 2000 conviction for the

3

unauthorized use of a vehicle without the owner's consent.  PSR ¶ 77-87.  In fact, Martinez was still serving a term of probation when he committed the instant offense. *Id.* at ¶ 89.  Thus, Martinez's total offense level was "literally off the Guidelines chart, resulting in a Guidelines range of life."  Dkt. No. 171 at 6-7.  I therefore sentenced Martinez principally to a term of life imprisonment.  *Martinez*, 953 F. Supp. 2d at 517.

Martinez appealed his convictions, and the Second Circuit affirmed the judgment in all respects. *United States v. Martinez*, 419 F. App'x 34, 38 (2d Cir. 2011) (summary order).  Martinez is currently incarcerated at Federal Correctional Institution ("FCI") Allenwood.  He is now fifty-three years old, and he has served almost eighteen years of his life sentence.  *See* Dkt. 184 at 19; Dkt. 186 at 5.

## II.    <u>Family Circumstances</u>

On April 23, 2011, while Martinez was incarcerated, his then-17-year-old son was brutally murdered at a house party.  Because he believes that had he not been in jail, his son would not have gone to the party, Martinez wrote in a letter to the Court that "for as long as I live I will blame myself for his death."  Dkt. 187, Martinez's personal letter to the Court (Def. Letter) at 1.[2]

Martinez has close relationships with his remaining children, and now has grandchildren.  Dkt. 184 at 5.  In his motion, Martinez asks to be afforded "the prospect

---

[2] On August 29, 2024, I ordered the Clerk of Court to seal certain exhibits attached to Martinez's motion. Dkt. 187.

of reuniting with his loved ones, including the opportunity to forge meaningful

relationships with his grandchildren upon release under supervised release." *Id.*

      In particular, Martinez expresses concern about his other son, who turned

18 on July 7, 2024 -- but was only four months old at the time of Martinez's arrest.  This

son is dealing with serious mental health problems.  Martinez wrote in his letter to the

Court that:

> [my son] desperately needs my help.  [He] gr[e]w up visiting and talking
> to me on the phone and was doing good, but when Covid-19 hit in 2019
> all visits stopped[.]  [I]t became virtually impossible to get on the phone to
> speak with him.  During that time depression grabbed hold of him and I
> almost lost another son.  [My son] dropped out of school at the age of 15,
> tried to commit suicide twice and started cutting himself with razors. . . .

Dkt. 187, Def. Letter at 1.  Despite having been in prison for virtually all of his son's life,

Martinez and his son have remained close.  He has had a positive impact on his son's

mental health and has helped him secure the tools he needs to have a successful life.

Martinez added that:

> Towards the end of 2023, I finally got to see my son again . . . . [O]n the
> first visit his mom brought him up and I told her to go to the bathroom so
> [he] and I could speak alone[.]  On that one visit, Your Honor, I don't
> know how I did it, but I managed to get him to stop cutting himself and to
> enroll in a G.E.D. course.  [His] mom told me that he has not cut himself
> since our talk and he has been going to school for his G.E.D.  For the
> second visit my daughter [brought] him to me and I succeeded in talking
> him into getting his driver's license, which he just recently took the test for
> and passed.

*Id.*  Nevertheless, Martinez's son continues to experience significant mental health

issues.  His son wrote his own letter to the Court dated January 14, 2024, noting that he

"is facing one of the most challenging times of [his] life" and continues to "struggle with

depression."  Dkt. 187, Martinez's son's letter to the Court at 1.  Martinez also wrote:

> Now his mom tells me that [my son] is hanging out with some older kids
> and that it[']s not looking good and she is worried . . . with no one to
> guide him, it will be really easy for the older kids to talk him into doing
> something stupid.  So I am begging Your Honor, grant me the opportunity
> to save my son before it's to[o] late.

Dkt. 187, Def. Letter at 1.

### III.    <u>Rehabilitation Efforts</u>

Martinez has now spent roughly a third of his life behind bars.  Martinez

has largely stayed out of trouble throughout his term of incarceration -- as the

Government points out, Martinez's disciplinary record in prison is "exemplary," "with

no infractions over [fourteen] years." Dkt. 186 at 4. [3]

Martinez earned his GED in prison and acquired various licenses and

certifications.  Dkt. 171 at 6.  He has gained experience in floor stripping, waxing and

maintenance, and baking.  *Id.*  Moreover, Martinez is currently working in the U.S.

Department of Labor Recycling and Reclamation Apprenticeship Program as part of

UNICOR, Allenwood's reentry program, and has logged nearly 5,000 hours in the

program to date.  Dkt. 187, Def. Letter at 1; Dkt. 184 at 6.  UNICOR Production

Controller J. Hodish, who has supervised Martinez since August 17, 2020, wrote to the

---

[3] Martinez was sanctioned for an incident occurring on February 15, 2010 for "refusing to obey
an order" and "being insolent to a staff member." Dkt. 186-1, Gov't Ex. B**.**

Court that Martinez has "established himself as a top worker in the factory" and has "helped many new staff members out by training them in the most effective ways to complete their work." Dkt. 184-1 at 30. He added that Martinez "always shows up to work on time and never misses a day of work." *Id.* Hodish described Martinez as a "hard working dedicated employee determined to do his best at anything he is tasked with." *Id.*

Martinez has also taken all available psychology programs at Allenwood to improve his mental health. Dkt. 171 at 6. And Martinez serves as a Suicide Watch Companion for other inmates, a role for which he is particularly suited given this education. Dkt. 184-1 at 29. In this role, Martinez "offer[s] [his] time to provide visual supervision of inmates placed on suicide watch within the institution and to respond to potentially life-threatening emergencies." *Id.* J. Sage, the Chief Psychologist at Allenwood, explained that Martinez was assigned to the Suicide Watch Companion Team because he had "superior institutional adjustment" and "demonstrate[ed]. . . maturity, responsibility and commitment to the well-being of fellow inmates." *Id.*

Letters from Martinez's fellow inmates also evidence his rehabilitation. Martinez is described as a leader at Allenwood, pushing his peers to work hard and to succeed, despite the challenges they face in prison. Donald Patterson, one such inmate, wrote that Martinez is "always giving me good advice about getting into the programs available here to better myself." *Id.* at 28. Patterson credits Martinez for getting him a

job at UNICOR and for being "helpful in showing [him] how to do [his] job correctly." *Id.*

Louis Allen, another inmate at Allenwood, called Martinez the "best thing that has happen[ed] to me." *Id.* at 32. He wrote that "[a] few times I was on the brink of getting into a fight but somehow [Martinez] always happens to be around to get me out of it by talking to the other guy and reminding me of all that I could lose . . . ." *Id.* He wrote that Martinez has "push[ed] me to do better and learn all I can so that when I go home I have the skills and education to succeed . . . ." *Id.*

And Lorenzon Roman, another of Martinez's fellow inmates, wrote that Martinez encouraged him to "take full advantage of this time and advocate [for] myself as much as possible." *Id.* at 34. Roman wrote:

> it took a lot of pushing and harassment -- [Martinez] even went so far as to signing me up for a couple classes he was in without me knowing. Now I have my GED, [and] graduate[d] from. . . . Blackstone Career Institution with 99.03%, [with] all licenses, certifications and work experience.

*Id.* Roman added that Martinez even taught him how to bake. *Id.*

**IV.    Martinez's Cancer Diagnosis**

On January 5, 2024, Martinez was diagnosed with stage four, metastatic neuroendocrine carcinoma, which is "non-curative." Dkt. 186-1, Govt. Ex. D at 358**.** Martinez receives treatment for this cancer both in prison and at an outside oncologist's office (at the University of Pittsburgh Medical Center). Dkt. 186 at 4. Martinez's cancer has since spread to his liver, spleen, and bones. *Id.* at 5. Martinez told the Court:

8

I now have about 3 dozen tumors spread throughout my liver, spleen and bones. . . . [W]hen the tumors were discovered in my liver and spleen I was already at stage 4 cancer, because it had spread from my intestine to my vital organs. My tumors were found in January 5, 2021 and the biggest one in my liver was the size of a large lemon with others around it which signifies that I have had cancer for quite some time before it was found. Now it has been over 3 years since my diagnosis and it has spread massively since then. Now I really don't believe I have that much time left.

Dkt. 187, Def. Letter at 2. While Martinez is currently able to walk and take care of himself, he may need to be transferred to a federal medical center in the near future. Dkt. 186 at 5. The Government acknowledges that "Martinez has a stage four, metastatic neuroendocrine carcinoma," which apparently was first identified in 2021. Dkt. 187 at 4. The Government further acknowledges the "non-curative/palliative intent" nature of his treatment. *Id.* at 4-5. In other words, Martinez's treatment focuses on improving his quality of life rather than curing his disease.

The Government spoke to the medical director at Martinez's facility, who confirmed that Martinez has a stage four tumor that has spread to Martinez's liver, spleen, and bones. *Id.* at 5. The medical director advises that "Martinez is *currently* able to walk and take care of himself but may need to be transferred to a federal medical center in the *near future*." *Id.* (emphasis added).

V.     **Martinez's Motions for Compassionate Release**

In 2020, Martinez filed a motion for relief pursuant to Section 404 of the First Step Act.  Dkt. 165.  On July 23, 2020, I denied the motion.  *Id.*  Martinez appealed and the Second Circuit affirmed.  *See* Dkt. 175.

On February 28, 2021, Martinez filed a motion for compassionate release in light of the COVID-19 pandemic.  Dkt. 168.  On August 2, 2021, I denied the motion, concluding that, even assuming Martinez had established an extraordinary and compelling reason for release, the section 3553(a) factors "still weigh[ed] heavily against compassionate release."  *Id.* at 6.  Martinez appealed this order, but the Second Circuit dismissed his appeal as untimely.  *See* Dkt. No. 175.

Martinez's present motion followed.  As in his earlier motions, Martinez argues there are extraordinary and compelling reasons warranting a reduction in his sentence.  Specifically, Martinez points to (1) disparities between his sentence and others who were convicted for similar offenses; (2) the difficult conditions of confinement and his exemplary disciplinary record and educational success in prison; and (3) his stage four cancer diagnosis.  *See* Dkt. 184.  On August 12, 2024, the Government submitted its response.  Dkt. 186.  Martinez filed a reply on August 29, 2024.  Dkt. 189.

## DISCUSSION

### I.     Applicable Law

As amended by the First Step Act, the compassionate release statute empowers sentencing courts to exercise their discretion in deciding motions such as Martinez's.  The First Step Act brought about "monumental" change -- that is, allowing for the "release of thousands of imprisoned people whom Congress and the Executive believed did not need to be incarcerated" -- but did so "incremental[ly]." *United States v. Brooker*, 976 F.3d 228, 230 (2d Cir. 2020).  Indeed, "rather than mandating more lenient outcomes, [the statute] favor[s] giving discretion to an appropriate decisionmaker to consider leniency." *Id.*

To be eligible for a reduced sentence, an incarcerated person must make three showings.  "First, absent waiver or forfeiture by the [G]overnment, an inmate must exhaust administrative remedies by requesting such relief from prison authorities." *United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2021) (per curiam).  Then, the court must "consider[] the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Jones*, 17 F.4th 371, 374-75 (2d Cir. 2021) (per curiam).  Finally, "the inmate must demonstrate that his proffered circumstances are indeed 'extraordinary and compelling' such that, in light of the[] § 3553(a) factors, a sentence reduction is justified . . . ." *Keitt*, 21 F.4th at 71.

Generally, the First Step Act "freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *Brooker*, 976 F.3d at 237.  Indeed, "a district court's discretion in this area -- as in all sentencing matters -- is broad." *Id.*  "[T]here is nothing in the compassionate release law requiring that a determination of extraordinary and compelling factors warranting compassionate release must be based on a single circumstance.  Rather, as the law permits and common sense dictates, the finding of extraordinary and compelling circumstances warranting release can be based on a combination of circumstances taken together." *United States v. Rengifo*, 569 F. Supp. 3d 180, 192-93 (S.D.N.Y. 2021); *cf. United States v. Sila*, No. 16-CR-0448-B, 2022 WL 800113, at *5 (N.D. Tex. Mar. 16, 2022) (denying sentence reduction where combination of circumstances was not extraordinary and compelling).

"The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'" *Brooker*, 976 F.3d at 237-38 (citing 28 U.S.C. § 994(t)). Rehabilitation can, however, "interact" with other factors to constitute extraordinary and compelling reasons to reduce a sentence.  *Id.* at 238 (discussing the interaction of rehabilitation and the effects of the COVID-19 pandemic); *see also United States v. Millan*, No. 91-CR-685, 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020) ("[R]ehabilitation *is relevant* to the question of whether a sentence should be reduced and that rehabilitation,

when considered together with other equitable factors, could constitute 'extraordinary and compelling reasons' for a sentence reduction." (emphasis in original)).

## II.  <u>Application</u>

As a threshold matter, it is undisputed that Martinez has exhausted his administrative remedies.  *See* Dkt. 186 at 3.  I therefore first consider whether extraordinary and compelling reasons exist permitting a reduced sentence.  I find that they do, based on a combination of factors, including Martinez's terminal cancer diagnosis, his family circumstances, the conditions of confinement over the last several years, and significant evidence of rehabilitation.  I then consider, in light of the factors set forth in 18 U.S.C. § 3553(a), whether a sentence reduction is warranted and, if so, to what extent.

### a.  *Extraordinary and Compelling Circumstances*

#### i.  *Martinez's Cancer Diagnosis*

When I considered Martinez's previous motion for compassionate release -- wherein Martinez argued that he was at heightened risk of COVID -- I noted that Martinez had already contracted COVID, with mild symptoms, and thus he had not established extraordinary circumstances.  See Dkt. No. 171 at 5-6.  Since that motion, Martinez has been diagnosed with stage four, metastatic neuroendocrine carcinoma, which is "non-curative" and has spread to Martinez's liver, spleen, and bones.  *See* Dkt.

186 at 4-5; Dkt. 187, UPMC Williamsport Radiology Report at 1; Dkt. 187, UMPC Williamsport PET CT Report at 1.

The Sentencing Commission has made clear that extraordinary and compelling reasons exist if "[t]he defendant is suffering from a terminal illness" and lists metastatic cancer as an example of such illness.  U.S.S.G. 1B1.13 n.1(A).  Because Martinez's metastatic cancer is terminal, Martinez's condition now plainly constitutes an extraordinary circumstance warranting a sentence reduction.

The Government argues that "whether Martinez's cancer diagnosis qualifies as an extraordinary and compelling reason for a sentence reduction is a close question," because though "Martinez will continue to experience worsening complications," he "is receiving treatment that attempts to slow the progression of the cancer and is, by all accounts, still able to walk and take care of himself."  Dkt. 186 at 5.

But the fact that doctors are "attempting to slow the progression" of Martinez's cancer does not take away from the fact that Martinez's illness is terminal and that, indeed, "in the near future" he may not be able to "walk and take care of himself."  Dkt. 186 at 5.  Martinez's terminal illness weighs in favor of a finding that "extraordinary and compelling circumstances" exist.

ii.  *Martinez's Family Circumstances*

Martinez's request to be released so he can "save his son before it is too late" is also compelling.  Dkt. 187, Def. Letter at 1.  Affidavits from Martinez's family

members corroborate the positive effect that Martinez's release would have on his son.

Mayra Padilla, the mother of Martinez's son, wrote to the Court that "[g]rowing up

without the presence of his father has been incredibly challenging for [her son], and it

has taken a toll on his emotional well-being and development." Dkt. 184-1 at 37.

Padilla added:

> "[a]s a single parent, I have done my best to provide a stable and
> nurturing environment for our son, but I cannot replace the unique role
> that a father plays in a child's life. I firmly believe that [Martinez] has the
> potential to positively contribute to our son's upbringing and to serve as a
> supportive and loving presence in his life."

*Id.*

Martinez's son's letter to the Court shows that Martinez's release would benefit him greatly. He wrote that he is "desperately in need of [Martinez's] support as [he] struggle[s] with depression and the difficulties of navigating life without a father figure." Dkt. 187, Martinez's son's letter to the Court at 1. The letter also demonstrates the time and effort that Martinez has committed to staying close to his son, despite his incarceration. *Id.* Martinez's son wrote that Martinez has "made it his initiative to be fully present and supportive of me." *Id.* He emphasized, however, that "all [of Martinez's] impact is restricted to a 15 minute phone call," and "[i]f given the opportunity to be released, [Martinez] would make more of a positive impact on not only myself, but our family and the community in general." *Id.*

And Martinez's own letter is further persuasive evidence that his son would benefit from his coming home. Martinez's ability to make his son stop self-harming after two suicide attempts, to get his son to apply for and receive his driver's license, and to persuade his son to earn his G.E.D all show that Martinez has a unique ability to help improve his son's quality of life. Dkt. 187, Def. Letter at 1.

In sum, these letters further my conclusion that extraordinary circumstances warrant relief. While "[i]t is true that illness of a close family member would not weigh in favor of [providing a sentence reduction for] every incarcerated person," *Rengifo*, 569 F. Supp. 3d at 196, Martinez's unique ability to get through to his son -- who suffers from severe mental health issues -- weighs in favor of a sentence reduction here. *See, e.g., id.* (finding defendant's desire to spend time with his terminally ill sister "contributed to the combination of extraordinary and compelling reasons warranting his release," which included the defendant's "considerable rehabilitation" and "conditions of confinement during lockdown"); *United States v. Hasanoff*, No. 10 Cr. 162, 2020 WL 6285308, *4-6 (S.D.N.Y. Oct. 27, 2020) (finding extraordinary and compelling reasons warranting release where defendant had "demonstrated that his mother require[ed] constant care and [defendant] himself [was] the only available caregiver" along with "extraordinary rehabilitation").

### iii.  The Conditions of Confinement

The conditions of confinement during the COVID-19 pandemic are also relevant.  First, I am cognizant that Martinez's cancer diagnosis places him at an increased risk of experiencing serious illness from COVID-19.  *See* Ctrs. for Disease Control and Prevention, People with Certain Medical Conditions and COVID-19 Risk Factors, https://www.cdc.gov/covid/risk-factors/index.html (last visited Sept. 13, 2024).  But this argument is generally less forceful now than at the outset of the pandemic.  *See, e.g.*, *United States v. Brown*, No. 18-CR-339-PAC-3, 2021 WL 5233506, at *3 (S.D.N.Y. Nov. 10, 2021) (noting that "the mass-release of vaccinations in the past months have dulled the threat of severe complications or death from COVID-19").  Still, his medical situation, such as it is, is a factor to consider.

Second, Martinez is incarcerated in a medium-security unit at Allenwood.  *See* Dkt. 186 at 5.  And I recently addressed the conditions of confinement in this very unit, observing, like many other courts in this District have, that the pandemic has "render[ed] the conditions of confinement far harsher and more punitive than the Court had anticipated."  *United States v. Banks*, No. 99-CR-1048-1, 2022 WL 16549304, at *6 (S.D.N.Y. Oct. 31, 2022) (citation omitted); *see also United States v. Snype*, 683 F. Supp. 3d 351, 363 (S.D.N.Y. 2023) (noting that in FCI Allenwood, defendant had "experienced repeated lockdowns, extended periods without visitation from family and legal counsel, and severely restricted movement").

Although Martinez's doctor "noted that the treatment Martinez is receiving is consistent with the treatment [he] would order for a non-incarcerated patient," Dkt. 186 at 5, it is hard to imagine that Martinez's treatment is as effective as that of a non-incarcerated patient's given the conditions at Allenwood. Indeed, Martinez attests that his radiologist, Dr. Enwonwu, has recommended two separate cancer treatments. Martinez, however, has been unable to receive these treatments because of his incarceration. Dkt. 189 at 4. For example, one such treatment is unavailable to Martinez because it requires a multi-day stay at an offsite hospital. And Martinez also notes that he has experienced "countless cancelled appointments" due to the staffing shortages at FCI Allenwood. Dkt. 189 at 5. As Daniel Chico, another individual who wrote to the Court in support of Martinez's release stated, "[t]he rigors of cancer treatment, coupled with the restrictive environment of incarceration, . . . exacerbate the already arduous journey towards recovery." Dkt. 184-1 at 31. The conditions of Martinez's confinement in conjunction with his illness therefore further my conclusion that extraordinary and compelling circumstances exist here.

*iv.  Martinez's Rehabilitation*

Martinez has compiled an exemplary record of rehabilitation, education, and leadership among his peers. Martinez has attained his GED and acquired dozens of licenses and certifications; logged nearly 5,000 hours in UNICOR; and completed 73 programs, including every psychology program available to improve his mental health.

*See* Dkt. 187, FSA Recidivism Risk Assessment at 1.  Despite his cancer diagnosis in 2021, which is accompanied by "[i]ndiscribable pain," Dkt. 187, Def. Letter at 2, Martinez has continued to work and excel at his job.  Martinez's work supervisor wrote that he is a "hard working[,] dedicated employee determined to do his best at anything he is tasked with."  Dkt. 184-1 at 30.  Martinez has also demonstrated a sincere commitment to mentoring other inmates in the prison.  Martinez's mentorship of others is illustrated by his participation in the Suicide Watch Companion Team.  And it is corroborated by his supervisor at work, who wrote that Martinez "has always been one of the production leaders . . . and has helped many new staff members out by training them in the most effective ways to complete their work."  Dkt. 184-1 at 30.  Martinez's mentorship is further supported by three letters from fellow inmates.  Each of these letters attests to Martinez's positive influence on the men at FCI Allenwood.  Martinez has counseled these men to abstain from violence, enroll in programs, and better themselves while they are in prison.  Dkt. 184-1 at 28; 32-35.  *See United States v. Underwood*, 88-CR-822 (SHS), 2021 WL 3204834, at *4-*5 (S.D.N.Y. Jan. 15, 2021) (granting sentence reduction in light of similar record of mentorship and absence of disciplinary infractions).

      I also find it significant that Martinez has not incurred a single disciplinary infraction within the last fourteen years.  And the only infractions appearing on his record, both arising from the same incident in 2010, were non-violent

in nature.  This is all the more commendable given that "violent incidents involving other prisoners and measures the facility took in response to the COVID-19 pandemic have made imprisonment [at FCI Allenwood] significantly more rigorous." *United States v. Banks*, No. 99 CR. 1048-1 (DC), 2022 WL 16549304, at *6 (S.D.N.Y. Oct. 31, 2022) (describing the conditions at FCI Allenwood in the medium security unit).

Finally, Martinez has acknowledged the gravity of his offenses and "fully accepts responsibility for his actions without seeking to justify or minimize them." Dkt. 184 at 9.  In his detailed letter to the court, Martinez wrote that he has "devoted all of [his] time into changing the way [he] used to think" and has taken full advantage of the educational and work opportunities he has been given in prison.  Dkt. 187, Def. Letter at 1.  And in his motion, which was also impressively written, Martinez added that "he now comprehends the wrongfulness of his past actions and has consciously chosen the path of self-improvement."  Dkt. 184 at 10.

The Government concedes that Martinez's rehabilitation is "commendable" but urges that "rehabilitation cannot be the sole basis for the finding of an 'extraordinary and compelling' reason for a sentence reduction."  Dkt. 186 at 4.  But I do not consider Martinez's rehabilitation in a vacuum.  As explained above, Martinez's terminal illness, his dire family circumstances, and the conditions of his confinement all play a part in establishing extraordinary circumstances warranting release.  His rehabilitation only lends further weight to the fact that extraordinary and compelling

20

circumstances exist here. *See United States v. Rodriguez*, 492 F. Supp. 3d 306, 311

(S.D.N.Y. 2020) (citing *United States v. Millan*, 91-CR-685 (LAP), 2020 WL 1674058, at *7

(S.D.N.Y. 2020)) ("[Congress] believed that rehabilitation is relevant to the question of

whether a sentence should be reduced and that rehabilitation, when considered

together with other equitable factors, could constitute 'extraordinary and compelling

reasons' for a sentence reduction."). When I consider these circumstances collectively, I

conclude that Martinez has made a showing of extraordinary and compelling reasons

sufficient to permit a reduction of his life sentence.

### b. *The Section 3353(a) Factors*

That Martinez has asserted extraordinary and compelling reasons for a

sentence reduction renders him eligible, under the First Step Act, for such a reduction. I

may only grant his motion, however, if I find that a sentence reduction is warranted in

light of the applicable factors in 18 U.S.C. § 3553(a). Considering the relevant section

3553(a) factors, I find that a substantial reduction is warranted and that a life sentence

would be greater punishment than necessary for Martinez.

In denying Martinez's previous motion for compassionate release, I

explained that even assuming Martinez had established extraordinary and compelling

reasons, my assessment of the applicable factors in 18 U.S.C. § 3553(a) still outweighed

his being released. Dkt. No. 171 at 6. I am no longer persuaded that these factors justify

Martinez spending the rest of his life in prison, especially given his cancer diagnosis, his continued rehabilitation in prison, and the needs of his family.

Martinez's crimes were extreme, as indeed he took a life. As I described at sentencing, Martinez's murder of Ortiz was barbarous -- he "executed [him] [and] then stood over the body and fired some more shots to finish the job," sending the message "that this was Mr. Martinez's turf and that if you came around and invaded his turf[,] this is what would happen to you." Sent. Tr. at 16–17. For the next 14 years, Martinez ran a massive narcotics operation, distributing approximately one kilogram of crack cocaine every week. Dkt. No. 171 at 6; *Martinez*, 953 F. Supp. 2d at 516. When I sentenced Martinez, his total offense level was "literally off the Guidelines chart, resulting in a Guidelines range of life." Dkt. No. 171 at 6-7. And the instant offenses represented Martinez's sixth criminal conviction, which he committed while on probation. *Id.*

Nonetheless, the murder occurred over thirty years ago, and Martinez has maintained a positive prison record over the past eighteen years. His rehabilitation is more than just "commendable." Dkt. No. 186 at 4. In fact, it is "extraordinary." Aside from maintaining a low-level disciplinary record, Martinez has shown himself to be a matured person, one who is eager to mentor and help others, to build community, and to succeed in employment, even as he has suffered from a terminal illness. *See* Dkt. 187, Def. Letter at 1-2. He has also shown himself to be a committed father to his children, as

he has continued to maintain relationships with them despite his imprisonment.  *See id.*;

Dkt. 187, Martinez's son's letter to the Court at 1.  Martinez's letter to the Court in

support of his motion displays remorse for his actions, a deep sadness for his son's

suffering, a strong commitment to helping him get better, and a request that he be given

another chance.  *Id.*  These, too, are aspects of Martinez's "history and characteristics," in

addition to his criminal record.  18 U.S.C. § 3553(a)(1).  Therefore, although the "nature

and circumstances of the offense" and Martinez's criminal history weigh against release,

I recognize that mitigating considerations -- along with the passage of time and the

change in circumstances -- support reducing Martinez's sentence.

As to the "the need for the sentence imposed to reflect the seriousness of

the offense, to promote respect for the law, and to provide just punishment for the

offense," 18 U.S.C. § 3553(a)(2)(A), these purposes, in Martinez's case, have largely been

accomplished.  He has spent eighteen years behind bars for this offense -- a third of his

life.  That is far from an insignificant sanction.

Next, as to "the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct," 18

U.S.C. § 3553(a)(6), I note that Martinez's early release would not create any meaningful

sentence disparities.  Statistics compiled by the United States Sentencing Commission,

for example, show that for fiscal year 2023, the nationwide average and median

sentence length for murder convictions was 285 and 276 months, respectively.  *See* U.S.

Sentencing Comm'n, Fiscal Year 2023 Statistical Information Packet: Southern District of

New York, at Table 7 (2023).  In the Southern District of New York, the average and

median sentence length was 233 and 240 months, respectively.  *Id*.  *See Carroll*, 2020 WL

8024485, at *8 (reducing "three strike" defendant's life sentence to time served because,

*inter alia*, his twenty-two year imprisonment for armed bank robbery surpassed the

average sentences for robbery, extortion/racketeering, child pornography, and murder).

Accordingly, this factor supports reducing Martinez's sentence.

        The "need for the sentence imposed to . . . afford adequate deterrence to

criminal conduct," 18 U.S.C. § 3553(a)(2)(B), and the need to "protect the public from

further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C), also weigh in favor of a

sentence reduction.  I am reassured not only by the marked differences in Martinez's

character and evidence of his extraordinary rehabilitation, but also by the fact that

Martinez, who was in his twenties when he committed the murder, is now 53 years old.

The recidivism rate for offenders released before age 50 is 54.1% -- substantially greater

than the rate of 33.6% for offenders released between ages 50 and 54.  *See* U.S.

Sentencing Comm'n, Older Offenders in the Federal System, at 55 (2022).  Moreover,

according to BOP's own "high[ly] predictive," Recidivism Risk Assessment Tool,

PATTERN version 1.3, Martinez poses a "minimum" risk of recidivism -- the lowest

classification level.[4]  Dkt. 187, FSA Recidivism Risk Assessment at 1; U.S. Dep't of Just.,

Predicting Recidivism: Continuing to Improve the Bureau of Prisons' Risk Assessment

Tool, PATTERN, (April 19, 2022), https://nij.ojp.gov/topics/articles/predicting-

recidivism-continuing-improve-bureau-prisons-risk-assessment-tool.  And the

recidivism rate for males in this category is 13.58%.  U.S. Dep't of Just., First Step Act

Ann. Rep., at 25 (April 2022).

      Along with Martinez's advanced age and PATTERN score, I also

acknowledge that Martinez will "continue to experience worsening complications" from

his stage four terminal cancer, Dkt. 186 at 5, and may be unable to care for himself in the

"near future."  *Id.*  I find that Martinez's medical circumstances further reduce any

likelihood of recidivism.  *See United States v. Rice*, 83-CR-150-3 (LGS), 2020 WL 4505813,

at *4 (S.D.N.Y. Aug. 5, 2020) (granting compassionate release despite defendant's

conviction for "very serious crimes" where defendant was significantly less likely to

recidivate due to his "advanced age and serious health problems").

      Finally, as to "the need for the sentenced imposed to . . .  provide the

defendant with needed educational or vocational training, medical care, or other

correctional treatment in the most effective manner," I do not believe that further

---

[4] BOP's PATTERN classification system consists of four categories: minimum, low, medium, and high.
Bureau of Prisons, Cut Points Used for PATTERN v. 1.3,
https://www.bop.gov/inmates/fsa/docs/fsa_cut_points.pdf?v=1.3 (last visited September 13, 2024).  BOP
designates inmates with "General" scores less than 5 and "Violent" scores less than 7 as having a
"minimum risk" of recidivism.  *Id.*  Martinez received a score of 2 in the "General" category and a score
of 1 in the "Violent" category.  Dkt. 187, FSA Recidivism Risk Assessment at 1.

extended incarceration would serve any additional purpose in this respect.  Martinez

has been an exemplary member of the prison community, completing nearly every

offered program, working thousands of hours in UNICOR, mentoring other inmates,

and serving as a Suicide Watch Companion.  As Martinez himself wrote, "after I am

finished with this U.S. Department of Labor Recycling and Reclamation Apprenticeship

Program that I am currently working on, there will be absolutely nothing else I can

learn here."  Dkt. 187, Def. Letter at 1.  And as for medical care, as discussed above, *see*

*supra* Discussion at Section II.a.iii, although Martinez is receiving cancer treatment at

Allenwood, he is likely to do better at home, with the support of his family.

Indeed, it appears that Martinez would be released into a stable and

supportive environment.  Martinez's brothers, Erick and David, both commit to

supporting Martinez upon his release.  *See* Dkt. 184-1 at 23 ("I stand fully prepared to

welcome [Martinez] into our home, ensuring he has his own space and access to the

resources necessary to embark on a new chapter"); *id.* at 15 ("Martinez will always be

welcome to our happy and humble home with full support and access for

employment.").  The mother of his son, Ms. Padilla, also wrote to the Court that she is

"committed to providing a stable and supportive environment for [Martinez's] reentry

into our lives and ensuring that he has the resources he needs to successfully reintegrate

into the community."  Dkt. 184-1 at 37.  Similarly, Maribel Pabon, the mother of

Martinez's daughter, wrote that "if you allow his release, my daughter and I would

26

guarantee he would have a place to stay and lead the rest of his life as an exemplary citizen." *Id.* at 36.  Martinez's family members are dedicated to providing Martinez with shelter and resources, and I am confident that he will be better suited to receive medical treatment upon release.

Finally, Martinez points to a number of cases where defendants "whose conduct is similar or worse than [his]. . . routinely receive far less than 'Life' sentences." Dkt. 184 at 16-17.  But as the Government points out, those disparities "often rely on fact-specific determinations about the offense conduct and the defendant's background."  Dkt. 186 at 4.  At sentencing, I carefully considered the egregiousness of Martinez's offense and sentenced him to a term of imprisonment that was warranted for the nature of his crime.  That sentence was an appropriate sentence at the time.

Still, a number of individuals serving life sentences for murder have been granted compassionate release after demonstrating extraordinary circumstances and exemplary rehabilitation.  Dkt. 184 at 17-19.[5]

---

[5]  *See, e.g*, *United States v. Tellier*, No. 92-CR-869 (LGS), 2023 WL 5498909, at *1 (S.D.N.Y. Aug. 25, 2023) (defendant, who had committed four murders and one attempted murder, was granted a sentence reduction from a life sentence to time served because of his extraordinary rehabilitation and health condition); *United States v. Lugo*, No. 01-CR-922 (NG), 2022 WL 732153, (E.D.N.Y. 2022), at *8 (granting compassionate release to a 63-year-old man who had committed murder, but had shown extraordinary rehabilitation in prison and suffered from a high susceptibility to COVID-19); *United States v. Scarpa*, No. 94-CR-1119-1 (ERK), 2020 WL 6591455, at *3 (E.D.N.Y. Nov. 11, 2020) (granting sentence reduction to time served where individual participated in conspiracies to commit murder but suffered from cancer complications and had shown extraordinary rehabilitation); *Reynolds v. United States*, No. 99-CR-520 (NGG), 2022 WL 1444167, at *6 (E.D.N.Y. May 6, 2022) (granting compassionate release to defendant convicted of murder who had shown extraordinary and compelling reasons because of his "evidently

One such case is *United States v. Rodriguez*.  492 F. Supp. 3d at 308.

Rodriguez, who had participated in the brutal murder of a government informant, was

granted a sentence reduction from a life sentence to thirty years' imprisonment after

serving twenty years in prison.  *Id.*  The court found that Rodriguez had demonstrated

extraordinary and compelling reasons justifying release because he was obese and had

Type II diabetes -- two factors that put him at a high risk of severe illness from COVID-

19.  The court also found "overwhelming evidence of Rodriguez's total rehabilitation,"

*id.* at 311, -- prison staff called Rodriguez a "mentor" to others, noted that Rodriguez had

a "very demanding job" as a washing machine operator, completed several courses, and

had earned his GED, among other accomplishments.  *Id.* at 311-13.  And the court noted

that "[a]n extraordinary collection of letters" -- from fellow inmates, family, friends, and

members of the prison staff – "ma[d]e clear that Rodriguez ha[d] used his twenty years

in prison not just to better himself but also to better his community."  *Id.* at 313.  The

Court granted the motion, reducing the life sentence to thirty years.

Martinez's circumstances are markedly similar to Rodriguez's.  Martinez,

like Rodriguez, has shown extraordinary reasons for release.  Indeed, while Rodriguez

faced the possibility of a severe illness, Martinez faces the *certainty* of such an illness.

---

substantial rehabilitation, the COVID-19 pandemic and the resulting harsh conditions of
custody"); *United States v. Russo*, 643 F. Supp. 3d 325, 339 (E.D.N.Y. 2022) (granting
compassionate release to a 70-year-old man who committed murder, but had high cholesterol,
high blood pressure, borderline diabetes and had rehabilitated himself in prison).

Further, like Rodgriguez, Martinez has set forth ample evidence of his rehabilitation in prison -- as discussed above, Martinez has acquired his GED, worked a demanding job, participated in courses to improve his mental health, and has served as a mentor to others.  And the Court received 25 letters of support from Martinez's friends, family, and prison staff.  These letters provide compelling evidence of Martinez's work ethic, leadership, and the ways in which he has transformed his life, as well as the lives of those around him, over the past eighteen years in prison.  I find that Martinez's significant rehabilitation, combined with his terminal cancer diagnosis and his son's significant mental health issues, suggest that there is little "need" for a life sentence at this juncture.

\* \* \*

At the very crux of compassionate release is the recognition that "no man is beyond redemption." *Lawson v. U.S. Citizenship & Immigr. Servs.*, 795 F. Supp. 2d 283, 298 (S.D.N.Y. 2011) (quoting *Yuen Jung v. Barber*, 184 F.2d 491, 495 (9th Cir. 1950)). Martinez has redeemed himself.  He has shown himself to be a caring, productive, and responsible person in his community.  With little or no hope of ever stepping foot outside a prison, Martinez spent the last eighteen years mentoring countless inmates, maintaining gainful employment -- all while keeping a "positive outlook on things," Dkt. 184-1 at 28, and even while, in recent years, suffering from terminal cancer and knowing that his son was suffering tremendously.  Martinez deserves a second chance.

Accordingly, after thorough consideration of the section 3553(a) factors --

in addition to Martinez's eighteen years of incarceration to date on this conviction, his

terminal illness, age, low-level disciplinary history, extraordinary rehabilitation, his

son's mental health, and his commitment to his children -- I conclude that a life term of

imprisonment in this case is no longer necessary and that the interests of justice weigh

in favor of a reduced sentence under section 3582(c)(l)(A)(i).  Martinez's sentence of life

imprisonment is hereby reduced to time served plus no more than thirty days.

## CONCLUSION

For the foregoing reasons, Martinez's motion for a sentence reduction is

GRANTED, and his sentence is modified to reduce the term of imprisonment from life

to time served plus no more than thirty days.  All other aspects of Martinez's sentence

remain in full force and effect.  The Government is directed to forward a copy of this

decision to the Warden at FCI Allenwood forthwith.  The Clerk is directed to close

Martinez's motion, Dkt. 184, and mail a copy of this decision to Defendant.

SO ORDERED.

Dated:      New York, New York
            September 13, 2024

DENNY CHIN
United States Circuit Judge
Sitting by Designation